IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Tina Eileen Wheeler, | ) | C/A No.: 1:13-445-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

I.      Relevant Background

A.      Procedural History

On September 22, 2009, Plaintiff filed applications for DIB and SSI in which she alleged her disability began on August 2, 2009. Tr. at 119–21, 124–30. Her applications

were denied initially and upon reconsideration.  Tr. at 92–93, 95–96.  On July 6, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ivar E. Avots.  Tr. at 28–70 (Hr'g Tr.).  The ALJ issued an unfavorable decision on October 28, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 12–23.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on February 18, 2013.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 49 years old at the time of the hearing.  Tr. at 38.  She earned her graduate equivalency diploma.  Tr. at 34.  Her past relevant work ("PRW") was as a knitting machine operator, sewing machine operator, mental retardation aide, sales clerk, and shift supervisor.  Tr. at 61.  She alleges she has been unable to work since August 2, 2009.  Tr. at 124.

2.    Medical History

On June 11, 2009, Plaintiff presented to Humaira Khalid, M.D., for regular follow up of multiple medical problems.  Tr. at 229.  She stated that she had some back pain, but that it had been better since she had been in therapy.  *Id.*  She stated that she had foot pain when she was on her feet for 10–12 hours at work, but otherwise had been stable.  *Id.*  She reported that her blood pressure had been stable, that she was trying to be more compliant with her CPAP (continuous positive air pressure) machine, and that her

migraines were stable with Topomax.  *Id.*  Dr. Khalid noted that Plaintiff should continue physical therapy and prescribed medications for her back pain, but also noted that he would order an MRI if Plaintiff had no improvement in the next month.  Tr. at 230. Plaintiff was discharged from physical therapy on August 4, 2009, and it was noted that she had not returned for her visits since June 24, 2009.  Tr. at 246.

On July 6, 2009, Plaintiff underwent an MRI study, which showed she had mild disc bulging and facet hypertrophy (enlargement) with no nerve root impingement in her lumbar and sacral spine.  Tr. at 410–11.

On July 17, 2009, she presented to John Haasis, M.D., with complaints of increasing back pain with radiation into her right lower extremity during the prior several months.  Tr. at 252.  She reported having undergone conservative care including physical therapy and medication trials with no significant benefit.  *Id.*  Dr. Haasis found Plaintiff was in no apparent distress and had a mildly antalgic gait.  Tr. at 254.  He noted that she displayed no evidence of muscle wasting or fasciculation (muscle twitch).  *Id.*  She had decreased range of motion and tenderness to palpation of her thoracolumbar spine, a positive straight leg raising test, diminished reflexes, and difficulty standing on her toes and heels and squatting.  Tr. at 255.  She had full muscle strength in all of her extremities, intact sensation, and a normal examination of her knees.  *Id.*  Dr. Haasis diagnosed right lower extremity pain, obesity, degenerative joint disease of the spine, muscle spasm, degenerative disc disease of the lumbar spine, facet joint syndrome and arthropathy, myofascial pain syndrome, low back pain, and lumbosacral spondylosis.  Tr. at 256.  He

recommended therapeutic injections under fluoroscopic guidance and prescribed Lortab. Tr. at 256.

Plaintiff returned to Dr. Haasis on August 20, 2009. Tr. at 250. He found she had point tenderness in her lower lumbar facets and increased pain with extension, but also had negative straight leg raising tests. *Id.* Dr. Haasis administered fluoroscopically-guided facet injections to Plaintiff's lumbar and sacral spine and prescribed Flexeril and Lortab. Tr. at 250–51.

In September 2009, Plaintiff presented to the Greer Hospital emergency room. Tr. at 412–30. She complained of lower back pain for the prior 20 years with worsening symptoms over the preceding two days. Tr. at 423. She rated her pain as an eight on a 10-point scale. *Id.* She reported a history of untreated hypertension, cholecystectomy and hernia repair, depression, migraine headaches, chronic back pain, degenerative disc disease, and sleep apnea. Tr. at 424. Edward Anderson, M.D., found Plaintiff appeared uncomfortable and in moderate pain. *Id.* He found she had decreased spinal ranges of motion and tenderness in her lower back. *Id.* He diagnosed acute exacerbation of chronic low back pain and degenerative disc disease and administered a Ketorolac injection. Tr. at 424–25. He prescribed medications, including Flexeril, Lortab, Nortriptyline, and Topamax (Tr. at 425).

In December 2009, Plaintiff presented to Taylors Free Medical Clinic ("Free Clinic") reporting itching since her nerve block injection. Tr. at 431. She complained of migraine headaches, back pain, and numbness in her legs. *Id.* She was obese with extremity edema. *Id.* Diagnoses included headaches, obesity, and lower extremity

4

edema, and the treater prescribed medications including Topamax, Fioricet, and Ultram. *Id.*

Plaintiff returned to the Free Clinic in January 2010 and was noted to have a long-standing back problem. Tr. at 432. It was further noted she was obese and had increased glucose and cholesterol. *Id.* She was prescribed Flexeril and Mobic. *Id.*

On February 8, 2010, Larry Korn, D.O., examined Plaintiff at the request of the state agency. Tr. at 435. Plaintiff complained of low back and knee pain. *Id.* Plaintiff reported that her back pain had become "really significant and worse" in the prior year and was exacerbated by doing household chores. *Id.* Plaintiff further stated that she could only tolerate about 10 minutes of weight bearing and could not sit long either. *Id.* Dr. Korn noted that Plaintiff had been fired from her job at CVS in August 2009 due to a personality conflict. Tr. at 436. Dr. Korn found that Plaintiff could do "some" limited serial threes and did not know the Vice-President's name. *Id.* She had a normal mood; communicated and comprehended well; spelled the word "world" backward; performed serial twos; and knew the date, day of the week, her location, and the President's name. *Id.*

Dr. Korn found Plaintiff was morbidly obese and had full ranges of motion in her upper extremities without crepitus, deformity, or edema. *Id.* She had limited joint motion in her lower extremities due to soft tissue barriers. *Id.* Plaintiff could squat to a point, though it was painful with some knee grinding and discomfort. *Id.* She did not have any obvious joint hypertrophy, but had a trace of edema in her legs. Tr. at 436–37. She had diminished reflexes in her forearms, trace reflexes at the patellae, and absent

Achilles reflexes, but normal digital dexterity, and the ability to heel, toe, and tandem walk. Tr. at 437. Dr. Korn stated it was difficult to assess her spinal curvature due to her obesity, but her pelvis appeared to be level and she had negative seated straight leg raising tests. *Id.*

Dr. Korn diagnosed severe morbid obesity, spondylosis of the lumbosacral spine, and chondromalacia of the knees (not ruling out degenerative joint disease). *Id.* He stated Plaintiff's back impairments with her profound truncal obesity combined to "severely limit her ability to perform the sorts of duty she describe[d] where she [was] bending and leaning for prolonged periods of time." Tr. at 437. He stated her knees prevented her from crouching on more than an occasional basis and her obesity, knees, and low back all combined to make it very difficult for her to pick up objects from the floor level on a repetitive basis. *Id.* He opined that she would have difficulty picking up objects of significant weight, i.e., over 20 pounds from floor level. *Id.* He stated her knees and obesity limited her from climbing ladders or scaffolding and she had a "slight" challenge climbing stairs. *Id.*

That same day, Plaintiff underwent bilateral knee x-rays, which showed osteoarthritic changes in her knees, likely most severe in the patellofemoral compartments. Tr. at 434.

On February 22, 2010, Hugh Clarke, M.D., a state-agency physician, reviewed the evidence and stated Plaintiff could lift 20 pounds occasionally and 10 pounds frequently Tr. at 441. He stated Plaintiff could stand or walk for at least two hours and sit for about six hours each in an eight-hour workday. *Id.* He stated she was limited to frequent

operation of foot controls bilaterally. *Id.* He stated she could never climb ladders, ropes, and scaffolds or kneel, but could occasionally climb ramps and stairs, balance, stoop, crouch, and crawl. Tr. at 442. He also stated she should avoid even moderate exposure to hazards (machinery, heights, etc.). Tr. at 444.

In March 2010, Plaintiff complained to the Free Clinic of upper abdominal pain and anxiety. Tr. at 452. The treating physician prescribed medications and weight loss and recommended an abdominal CT scan. *Id.*

Plaintiff returned to the Free Clinic in May 2010 with complaints of back problems after falling the prior month. Tr. at 451. Rebecca Smith, M.D., noted Plaintiff was obese and had mild wheezing. *Id.* She also found Plaintiff had lower back tenderness, but negative straight leg raising tests. *Id.* Dr. Smith diagnosed, among other things, low back pain with right sciatica and prescribed medications, including Naprosyn. *Id.*

In June 2010, Plaintiff underwent a lumbar spine x-ray at the Free Clinic, the results of which W. Clark Jernigan, M.D., stated were "normal for [her] age." Tr. at 448. In July 2010, Plaintiff complained to Dr. Smith of low back pain "so bad it w[oke] her up at night" and numbness and tingling in her right leg. Tr. at 450. She stated that, while she started taking Trazodone the prior week, she still had difficulty sleeping. *Id.* Dr. Smith's diagnoses included depression/insomnia, low back pain, sciatica, and hypertension. *Id.* She continued Plaintiff's medications and recommended back exercises. *Id.*

In August 2010, Plaintiff received a prescription for a Medrol Dosepak. Tr. at 449. On September 7, 2010, Plaintiff presented to the Free Clinic, where Dr. Jernigan found she had a positive straight leg raising test on the right, but a negative straight leg raising test on the left. Tr. at 482. He also found she had intact sensation; diagnosed chronic back pain; and recommended exercise, weight loss, and over-the-counter analgesics. *Id.*

On September 16, 2010, Plaintiff complained to the Free Clinic that she continued with chronic back pain, was depressed, and needed an antidepressant. Tr. at 483. Examination revealed Plaintiff had a venous stasis ulcer on her right leg. *Id.*; *see also* Tr. at 484. Plaintiff was prescribed medications, including Zoloft, and advised to stop smoking and lose weight. Tr. at 483.

That same day, Dale Van Slooten, M.D., a state-agency physician, reviewed the evidence and stated Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently. Tr. at 456. He stated she could stand or walk for at least two hours and sit for about six hours each in an eight-hour workday and was limited to frequent operation of foot controls bilaterally. *Id.* He stated she could never climb ladders, ropes, or scaffolds or kneel, but occasionally climb ramps and stairs, balance, stoop, crouch, and crawl. Tr. at 457. He stated she should avoid even moderate exposure to hazards (machinery, heights, etc.). Tr. at 459. Dr. Van Slooten stated that Plaintiff's allegations were credible, but did not preclude the performance of all levels of work activity. Tr. at 460.

On October 14, 2010, Plaintiff returned to the Free Clinic with complaints of an ulcer on her right leg and anxiety. Tr. at 484. She stated that Zoloft "help[ed] some."

*Id.* Dr. Smith found Plaintiff was obese with a healing ulcer on her right lower extremity. *Id.* Dr. Smith diagnosed venous ulcer, hypertension, and anxiety/depression. *Id.* She prescribed medications, including Zoloft. *Id.*

On October 26, 2010, Carrie Edmonds, a licensed practical counselor, stated Plaintiff could only occasionally interact with the public, and respond appropriately to work pressures and changes in a routine work setting. Tr. at 477. She stated Plaintiff had depression and anxiety as demonstrated by difficulty focusing, decreased energy and motivation, and increased sadness and crying. Tr. at 478. She stated Plaintiff was somewhat hopeless, had increased sleep, and would have difficulty managing full time employment. *Id.* She also stated Plaintiff was unable to consistently attend work 18 days out of 20 and would likely decompensate under the stress of simple, routine work loads of 40 hours per week. *Id.*

In November 2010, Dr. Jernigan stated Plaintiff could lift and carry up to 20 pounds continuously and 21 to 50 pounds frequently based on her obesity. Tr. at 479. He stated that she could sit, stand, or walk for eight hours each in an eight-hour workday. *Id.* He stated she did not require a cane to ambulate and could continuously reach, handle, finger, feel, push, and pull. Tr. at 480. He "[did not] know" which of Plaintiff's hands was dominant. *Id.* He stated Plaintiff could never climb ladders or scaffolds, but could occasionally climb stairs and ramps and continuously perform all other postural activities. Tr. at 481. He stated Plaintiff would never be absent from work as a result of her impairments or treatment. *Id.* When asked how often Plaintiff's pain was severe enough to interfere with attention and concentration, he stated he "ha[d] no way to

know," and stated her limitations did not last, nor were they expected to last, for 12 months. *Id.*

In December 2010, Plaintiff reported to the Free Clinic that she had trouble sleeping, was depressed, cried a lot, and she felt little relief with medications. Tr. at 485. She had an ulcer on her right lower leg. *Id.* Zoloft was discontinued and other medications, including Wellbutrin were prescribed. *Id.*

The following month, Plaintiff reported to the Free Clinic that her back hurt, but she "fe[lt] a little better" and her weight was down. Tr. at 487. Plaintiff's Wellbutrin was continued and weight loss was again recommended. *Id.* In February 2011, Plaintiff returned to the Free Clinic with complaints of depression. Tr. at 488. Dr. Smith's diagnoses included resolving right leg ulcer and agitation. *Id.* She prescribed medications, including Vistaril, and Wellbutrin and recommended weight loss. *Id.*

On April 11, 2011, Plaintiff reported that there was "something going on with [her] eye" to Dr. Smith. Tr. at 489. Dr. Smith found Plaintiff had left eye pruritus, obesity, discoloration and edema of her lower extremities bilaterally, and a healed ulcer on her right leg. *Id.* Dr. Smith diagnosed, among other things, insomnia that was stable on medications. *Id.* She prescribed medications, including Wellbutrin. *Id.*

In June 2011, Plaintiff presented to Dr. Smith with complaints of low back pain, depression, anxiety, and peripheral vascular disease. Tr. at 491. Plaintiff's headaches and hypertension were noted to be stable. *Id.* Dr. Smith found Plaintiff was obese, used a cane, and was slow to rise and sit. *Id.* She found Plaintiff had back tenderness and weak patellar reflexes, but normal range of motion and the ability to stand easily on each

foot.  *Id.*  Dr. Smith discontinued Wellbutrin, prescribed Cymbalta, and adjusted Plaintiff's Trazodone.  *Id.*

In July 2011, Dr. Smith prepared a medical source statement in which she indicated that Plaintiff's diagnoses included lower back pain with sciatica, anxiety/depression/insomnia, diabetes, hyperlipidemia, and hypertension.  Tr. at 492. Dr. Smith stated that Plaintiff's low back pain was chronic in nature and caused tingling, numbness, and pain.  *Id.*  The doctor noted that Plaintiff's diagnoses were supported by her obesity, use of a cane, and slow rising and sitting, back tenderness, and weak patellar reflexes.  *Id.*  Dr. Smith indicated that Plaintiff's medications could cause drowsiness and that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations.  *Id.*  Dr. Smith opined Plaintiff could walk for less than a block without rest or severe pain; could sit for one to two hours and stand for 10 to 15 minutes each at one time; could stand and walk for less than two hours and sit for at least six hours each in an eight-hour workday; needed a job that permitted shifting positions at will from sitting, standing, or walking; needed to walk around every hour for five minutes in an eight-hour workday; and needed unscheduled breaks during a workday.  Tr. at 493.  She stated that Plaintiff needed a cane for balance, pain, and weakness and could never lift, carry, twist, stoop, crouch, squat, or climb.  Tr. at 494.  She stated Plaintiff would miss four days of work per month.  Tr. at 495.  Dr. Smith recommended a referral to the Free Clinic's orthopedist, Dr. Jernigan, if Plaintiff needed a further, detailed examination.  *Id.*

C.      The Administrative Proceedings

        1.      The Administrative Hearing

                a.      Plaintiff's Testimony

At the hearing on July 6, 2011, Plaintiff testified she had degenerative arthritis in her lower back with two bulging discs that were pressing on a nerve, causing her to lose reflex in her legs.  Tr. at 37–38, 42.  She stated she had not undergone surgery on her back, but had two surgeries on her left knee.  Tr. at 38–39.  She rated her pain as a 10 on a 10-point scale (Tr. at 51) for which she took medications that she said did not really help (Tr. 42–43).  She stated she used a cane daily and that the cane was prescribed by her doctor.  Tr. at 39.  She testified she had migraine headaches controlled for the most part with medications.  Tr. at 40.  She stated she had one to two migraine headaches per week where she had to lie down in a dark room without any noise for five to six hours. Tr. at 40–41.  She reported she used a CPAP machine for sleep apnea and took medications for high blood pressure and diabetes.  Tr. at 40–41.

Plaintiff stated she was 5'4" tall and weighed 300 pounds.  Tr. at 34–35.  She noted she gained weight due to medications and had problems with her back and knees that limited exercise.  Tr. at 42.  She stated that, because of her back pain, she was unable to do anything to lose weight and needed gastric bypass or lap band surgery.  Tr. at 49. She testified she had depression and anxiety, and stated that she cried throughout the day, sometimes every day.  Tr. at 43–44.  She stated she sometimes did not get out of bed during the day.  Tr. at 47.  She stated she took Cymbalta (Tr. at 59) and that her

medications caused side effects of fatigue and concentration and memory problems (Tr. at 51).

Plaintiff testified that she lived alone. Tr. at 33. She stated she sat or lied down during the day and occasionally cooked simple meals, but had to sit down frequently. Tr. at 45. She stated she tried to do household chores by herself a little at a time. *Id.* She reported she watched television, used her computer for Facebook and e-mails (Tr. at 45, 55–57), and read and crocheted a couple of hours per day (Tr. at 55). She stated that she attended church every Sunday when able. Tr. at 55. She stated she shopped if necessary, using the cart to lean on. Tr. at 51. She noted she drove once or twice a week about five to ten miles to the grocery store, clinic, or pharmacy. Tr. at 43. Plaintiff stated that, contrary to Dr. Jernigan's opinion, she could only sit for five minutes and stand for five to ten minutes. Tr. at 46. She claimed that Dr. Jernigan never performed any physical examination on her. Tr. at 38, 45–46. She stated that she drew unemployment benefits beginning in 2009 and ending in February 2011. Tr. at 35.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Stephen Carpenter reviewed the record and testified at the hearing. Tr. at 60. The VE categorized Plaintiff's PRW as a knitting machine operator as medium, semi-skilled work; as a sewing machine operator as light, unskilled work; as a mental retardation aide as medium, semi-skilled to skilled work; as a sales clerk as light, semi-skilled work; and as a shift supervisor as light, skilled work. Tr. at 61. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; stand

and/or walk two hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently operate foot controls bilaterally; never climb a ladder, rope, or scaffold; never kneel; and occasionally perform all other postural limitations. Tr. at 63. The ALJ further stated that the hypothetical individual should avoid even moderate exposure to hazards such as dangerous machinery or unprotected heights. *Id.* The VE testified that the hypothetical individual would not be able to perform Plaintiff's PRW. Tr. at 63–64. The ALJ asked whether there were any other jobs in the regional or national economy that the hypothetical person could perform. Tr. at 64. The VE identified the jobs of clerk and data examination clerk that would utilize Plaintiff's transferrable skills. Tr. at 64–65. The VE also identified the sedentary, unskilled jobs of order clerk and address clerk. Tr. at 65. The ALJ then further limited the hypothetical individual to simple, routine, and repetitive tasks for two-hour periods based on moderate mental limitations and stated that she could occasionally interact with the public and interact appropriately with co-workers and supervisors. Tr. at 66. The VE stated that the hypothetical individual could still perform the job of addresser and could also perform the jobs of call-out operator, sorter, and document preparer. Tr. at 66–67.

Upon questioning by Plaintiff's counsel, the VE stated that the hypothetical individual could not perform any employment if she could stand for a maximum of two hours and sit for a maximum of two hours in an eight-hour workday. Tr. at 68. The VE also testified that a person missing four days of work per month would not qualify for full-time employment and missing three days of work per month would likely cause termination within a few weeks to a few months. Tr. at 69.

14

2.    The ALJ's Findings

In his decision of October 28, 2011, the ALJ made the following findings of fact

and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security
Act through December 31, 2014.

2.    The claimant has not engaged in substantial gainful activity since August 2,
2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et
seq.*).

3.    The claimant has the following severe combination of impairments:
osteoarthritis of the bilateral knees, degenerative disc disease of the lumbar
spine, obesity, depression and anxiety (20 CFR 404.1520(c) and
416.920(c)).

4.    The claimant does not have an impairment or combination of impairments
that meets or medically equals one of the listed impairments in 20 CFR Part
404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,
416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant's
residual functional capacity falls between the ranges of light and sedentary
work as defined in 20 CFR 404.1567(b) and 416.967(b).  Specifically, the
claimant can lift and carry 20 pounds occasionally, 10 pounds frequently,
stand and/or walk for a total of two out of eight hours, with normal breaks
and sit for six out of eight hours, with normal breaks.  Pushing/pulling
would be limited in the lower extremities to frequent operation of foot
controls bilaterally.  She would be restricted to no climbing of ladders,
ropes and scaffolds; no kneeling; occasional performance of all other
postural activities; and avoidance of even moderate exposure to hazards,
including dangerous machinery and unprotected heights.  The claimant has
moderate mental limitations, but in spite of these, she could still
concentrate and work at a pace to do simple routine repetitive tasks, at level
three common sense reasoning per the Dictionary of Occupational Titles,
for two hour periods in an eight-hour day and could interact occasionally
with the public and interact appropriately with co-workers and supervisors
in this type of stable routine setting.

6.    The claimant is unable to perform any past relevant work (20 CFR
404.1565 and 416.965).

7.    The claimant was born on May 9, 1962 and was 47 years old, which is
defined as a younger individual age 18–49, on the alleged disability onset
date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least the equivalent of a high school education and is
able to communicate in English (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from August 2, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 14–23.

II.   Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)   the ALJ failed to properly evaluate the opinions of Dr. Smith and Ms. Edmonds;

2)   the ALJ mischaracterized and misstated the record in significant respects; and

3)   the ALJ's credibility determination was in error.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

16

expected to result in death or which has lasted or can be expected to last for
at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

step, no further inquiry is necessary.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work.  *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b), Social Security Ruling ("SSR") 82–62 (1982).  The claimant bears the burden of establishing her inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW.  *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002).  If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work.  *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly-tailored to determine whether the

findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Opinion Evidence

Plaintiff contends that the ALJ improperly dismissed the opinions of her treating physician, Dr. Smith, and her counselor, Ms. Edmonds. [Entry #15 at 6–7]. The Commissioner contends that the ALJ reasonably considered these opinions and that,

because Ms. Edmonds is not an acceptable medical source under the applicable regulations, her statement is not considered a medical opinion.  [Entry #17 at 12–19].

a.     Dr. Smith's Opinion

It is undisputed that Dr. Smith was one of Plaintiff's treating physicians.  If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it will be given controlling weight.  SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).  The Commissioner typically accords greater weight to the opinion of a claimant's treating medical sources because such sources are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  However, "the rule does not require that the testimony be given controlling weight."  *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam).  Rather, "[c]ourts evaluate and weigh medical opinions pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist."  *Johnson*, 434 F.3d at 654.  The ALJ has the discretion to

give less weight to the opinion of a treating physician when there is "persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d, 171, 176 (4th Cir. 2001). In undertaking a review of the ALJ's treatment of a claimant's treating sources, the court focuses its review on whether the ALJ's opinion is supported by substantial evidence, because the court's role is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig*, 76 F.3d at 589.

In July 2011, Dr. Smith prepared a medical source statement in which she indicated that Plaintiff's diagnoses included lower back pain with sciatica, anxiety/depression/insomnia, diabetes, hyperlipidemia, and hypertension. Tr. at 492. Dr. Smith stated that Plaintiff's low back pain was chronic in nature and caused tingling, numbness, and pain. *Id.* The doctor noted that Plaintiff's diagnoses were supported by her obesity, use of a cane, and slow rising and sitting, back tenderness, and weak patellar reflexes. *Id.* Dr. Smith indicated that Plaintiff's medications could cause drowsiness and that emotional factors contributed to the severity of Plaintiff's symptoms and functional limitations. *Id.* Dr. Smith opined Plaintiff could walk for less than a block without rest or severe pain; could sit for one to two hours and stand for 10 to 15 minutes each at one time; could stand and walk for less than two hours and sit for at least six hours each in an eight-hour workday; needed a job that permitted shifting positions at will from sitting, standing, or walking; needed to walk around every hour for five minutes in an eight-hour workday; and needed unscheduled breaks during a workday. Tr. at 493. She stated that Plaintiff needed a cane for balance, pain, and weakness and could never lift, carry, twist, stoop, crouch, squat, or climb. Tr. at 494. She stated Plaintiff would miss four days of

work per month.  Tr. at 495.  Dr. Smith recommended a referral to the Free Clinic's orthopedist, Dr. Jernigan, if Plaintiff needed a further, detailed examination.  *Id.*

The ALJ accorded Dr. Smith's opinion little weight.  Tr. at 21.  As he was required to do, he evaluated the opinion and found that it was not fully supported by or consistent with the medical evidence of record, including the treatment records from the Free Clinic where Dr. Smith practices.  Tr. at 20.  The ALJ noted that the medical records revealed no evidence of any significant functional limitations resulting from Plaintiff's impairments.  *Id.*  He stated that it appeared that Dr. Smith was overly sympathetic to Plaintiff when filling out the disability forms.  Tr. at 20–21.  Finally, the ALJ noted that Dr. Smith's opinion was clearly contradicted by the opinion of Dr. Jernigan, another treating physician at the Free Clinic.  Tr. at 21.  Dr. Jernigan opined that Plaintiff could sit, stand, and walk eight hours in an eight-hour day; could not climb ladders or scaffolds; could occasionally climb stairs and ramps; could balance, stoop, kneel, crouch, and crawl; and would never be absent from work due to her impairments.  Tr. at 21; *see also* Tr. at 479–81.

Plaintiff argues that the ALJ dismissed Dr. Smith's opinion without any basis [Entry #15 at 6]; however, this argument is unavailing given the specific reasons noted by the ALJ in support of his decision to accord the opinion limited weight.  Plaintiff also argues that the ALJ improperly placed more weight on the opinions of the non-examining, state-agency consultants and states that their medical opinions are entitled to less weight because they did not examine her.  *Id.* at 7.  In making this argument, Plaintiff

inexplicably fails to recognize that the ALJ also relied on the opinion of Dr. Jernigan, one of her treating physicians.

Because the ALJ offered several concrete reasons for discounting Dr. Smith's opinion and Plaintiff has failed to demonstrate any error in the ALJ's reasoning, the undersigned recommends finding that the ALJ's decision to discount Dr. Smith's opinion is supported by substantial evidence.

### b.    Ms. Edmonds's Opinion

Plaintiff also contends that the ALJ failed to properly weigh the opinion of her counselor, Ms. Edmonds.  [Entry #15 at 6].  On October 26, 2010, Ms. Edmonds stated Plaintiff could only occasionally interact with the public, and respond appropriately to work pressures and changes in a routine work setting.  Tr. at 477.  She stated Plaintiff had depression and anxiety as demonstrated by difficulty focusing, decreased energy and motivation, and increased sadness and crying.  Tr. at 478.  She stated Plaintiff was somewhat hopeless, had increased sleep, and would have difficulty managing full time employment.  *Id.*  She also stated Plaintiff was unable to consistently attend work 18 days out of 20 and would likely decompensate under the stress of simple, routine work loads of 40 hours per week.  *Id.*

The Commissioner contends that Ms. Edmonds was not an acceptable medical source and her opinion cannot be given controlling weight.  [Entry #17 at 16–17].  The Commissioner further argues that the ALJ properly evaluated Ms. Edmonds as an "other source" and reasonably concluded that her opinion was entitled to little weight.  *Id.* at 17.

The Social Security Regulations distinguish between opinions from "acceptable medical sources" and "other sources." *See* 20 C.F.R. §§ 404.1513, 416.913. Acceptable medical sources are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.*

Plaintiff has not disputed the Commissioner's assertion that Ms. Edmonds is not an acceptable medical source. Based on the definition of "acceptable medical source" found in the regulations, the undersigned agrees that Ms. Edmonds is not an acceptable medical source. This distinction matters little, however, because the ALJ analyzed Ms. Edmonds's opinion in the same way that he analyzed Dr. Smith's opinion and provided the same reasons for discounting both opinions. *See* Tr. at 20–21. Consistent with the recommendation regarding Dr. Smith's opinion, the undersigned recommends a finding that the ALJ's decision to discount the opinion of Ms. Edmonds is supported by substantial evidence.

### 2.    Credibility Analysis

Plaintiff also contends that the ALJ erred in his credibility assessment because he (1) used boilerplate language in his credibility determination, (2) failed to accord Plaintiff's testimony "substantial credibility" in light of her work history, and (3) impermissibly based his decision on his observations of Plaintiff during the hearing. [Entry #15 at 10–11].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the

24

severity and persistence alleged.  *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain).  The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain."  76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence."  SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, the ALJ must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence.  *Hatcher v. Sec'y, Dep't of Health & Human Servs.*, 898 F.2d 21, 23 (4th Cir. 1989).  "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR 96-7p, ¶ 5.  In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence,

which can include the following: the objective medical evidence; the individual's activities of daily living ("ADLs"); the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process.  *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairments could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's testimony "concerning the intensity, persistence and limiting effects" of her symptoms was "not entirely credible to the extent" the testimony was inconsistent with the ALJ's determination of her RFC.  Tr. at 18.

The ALJ went on to provide numerous reasons for discounting Plaintiff's credibility including: (1) although Plaintiff testified to severe (10/10) pain, she sat quietly during the hearing and showed no signs of distress; (2) she was never in any acute distress during the examinations in the record and those examinations were essentially benign; (3) her treatment was conservative; (4) medical records do not corroborate the medication side effects Plaintiff alleges; (5) she retained the ability to perform a

significant range of ADLs, including shopping for groceries once a week, attending church, managing finances, reading, using the computer, and watching television; and (6) Plaintiff accepted unemployment compensation from 2009 to 2011 and was required to certify that she was able and available to work during that time. Tr. at 18. Based on the foregoing, the undersigned recommends a finding that the ALJ's credibility determination is supported by substantial evidence.

The specific allegations of error that Plaintiff alleges do not warrant remand. While the ALJ used boilerplate language in his decision, is not error to do so unless he fails to provide an explanation in support of the finding. *See McFadden v. Astrue*, C/A No. 9:11–1087, 2012 U.S. Dist. LEXIS 113845, at *2–3 (D.S.C. Aug. 14, 2012). Here, the ALJ provided concrete reasons for his credibility determination. Thus, contrary to Plaintiff's assertions, the "conclusory allegations" regarding her credibility were supported by proper findings and reasoning.

Likewise, the ALJ's alleged failure to accord adequate weight to Plaintiff's work history does not warrant remand. Plaintiff contends that based on her good work history, her testimony is entitled to substantial credibility. [Entry #15 at 11]. Her argument is based on an out-of-circuit case with facts that are distinguishable from those presented here. In *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979), the plaintiff had worked for 29 consecutive years, 15 of them with the same employer. Plaintiff does not have a comparable work history. While she has worked at several different jobs over a number of years, she has not worked at any of them for a length of time comparable to the plaintiff in *Dobrowolsky*. Furthermore, Plaintiff has provided no binding authority to

27

demonstrate that a good work history is sufficient to overcome the numerous reasons cited by the ALJ in discounting Plaintiff's credibility. For these reasons, Plaintiff's argument is insufficient to establish that the ALJ erred in his credibility determination.

Finally, Plaintiff contends that the ALJ impermissibly applied a "sit and squirm standard" when he noted that she sat quietly during the hearing and showed no signs of distress. [Entry #15 at 11]. Pursuant to SSR 96–7p, where a claimant attends a hearing before an ALJ, the ALJ may "consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements." The ALJ in this case did not rely solely on his observations of Plaintiff in discounting her credibility. Rather, as is permitted by SSR 96–7p, it was one factor of many. Consequently, the undersigned recommends a finding that the ALJ's consideration of his observations of Plaintiff at the hearing was not in error.

For the foregoing reasons, the undersigned recommends a finding that the ALJ's credibility assessment is supported by substantial evidence and in compliance with the applicable regulations.

### 3.     Alleged Mischaracterizations of Evidence

Plaintiff also asserts that the ALJ mischaracterized and misstated the record in significant respects. [Entry #15 at 8]. The Commissioner disputes Plaintiff's assertion. [Entry #17 at 19].

Plaintiff argues that the ALJ erred in finding that her migraine headaches are controlled for the most part with medication. [Entry #15 at 8]. She asserts that the evidence shows that her headaches are not controlled with medication, that she testified

that she has to lie down in a dark room for five to six hours once or twice a week to alleviate her headaches, and that there is nothing in the record to indicate that her alleged weekly migraines are controlled by medications.  *Id.*  The Commissioner notes that the medical records from the relevant time period only mention migraine headaches twice and that Plaintiff testified that medications controlled her migraines "for the most part." [Entry #17 at 19–20].  The Commissioner also notes that although Plaintiff testified she had to lie down in a dark room for five to six hours to alleviate her headaches, the ALJ reasonably discounted the credibility of Plaintiff's subjective complaints.  *Id.* at 20.

Plaintiff's argument that the ALJ's migraine-related finding was in error appears to be based entirely on her own conflicting testimony that medications controlled her migraines for the most part, but that she also had to lie down in a dark room for five to six hours once or twice a week to alleviate them.  Because the ALJ reasonably discounted Plaintiff's testimony and there is no evidence of such severe headaches in Plaintiff's medical records, the undersigned recommends a finding that the ALJ did not err by using Plaintiff's own words to conclude that her headaches are controlled "for the most part" with medication.

Plaintiff next contends that it was unreasonable for the ALJ to find that her sleep apnea had been successfully treated by the use of a CPAP machine because (1) dependence on a machine that forces air into her respiratory system does not constitute a cure for a chronic condition, (2) the ALJ did not consider the fact that the face mask is uncomfortable or that forced-air treatment is uncomfortable, and (3) the ALJ did not consider the debilitating effects of the CPAP machine on her daily activities.  [Entry #15

at 8]. The record contains no discussion of the CPAP machine interfering with Plaintiff's functional limitations or her ADLs. At the hearing, Plaintiff testified to using a CPAP machine, but did not state that it limited her in any way or that her sleep apnea impacted her functional limitations. For these reasons, the undersigned recommends a finding that the ALJ did not err in finding Plaintiff's sleep apnea was successfully treated with the CPAP machine.

Finally, Plaintiff contends that the ALJ erred by concluding that because she can live alone, she is not disabled. [Entry #15 at 9]. She further argues that the fact that she can prepare simple meals, take care of her personal grooming, drive to the store, and go to church does not give rise to the conclusion that she does not suffer from severe limitations. *Id.* Contrary to Plaintiff's assertion, the ALJ's finding of non-disability was not premised solely on her ability to live alone. Rather, the ALJ considered Plaintiff's ADLs as one component of the overall credibility analysis. Such consideration is specifically contemplated by SSR 96-7p. Thus, the undersigned recommends a finding that the ALJ did not improperly rely on Plaintiff's ADLs in his decision.

Based on the foregoing, the undersigned concludes that Plaintiff's arguments regarding the ALJ's alleged misstatements and mischaracterizations of the record are unavailing.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and

law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

      IT IS SO RECOMMENDED.

May 5, 2014                         Shiva V. Hodges
Columbia, South Carolina        United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).